**In re The DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**MDL No. 378.**

United States District Court,
D. Kansas.

Sept. 13, 1983.

On Motion to Certify Constitutional Issues
Jan. 25, 1984.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for plaintiff.

Larry P. Ellsworth, Marcia K. Sowles, Samuel Soopper, Dept. of Energy, Office of Gen. Counsel, Washington, D.C., for Dept. of Energy.

Brian G. Grace, Curfman, Harris, Stallings, Grace & Snow, Wichita, Kan., for Tenneco Oil, Pennzoil, Tosco, Ashland Oil, Texas City Refining.

Alexander B. Mitchell, Wichita, Kan., Harold E. Kohn, Michael D. Hausfeld, Joseph C. Kohn, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for Nat. Freight, Inc. and Philadelphia Elec. Co.

George G. Olsen, Williams & Jensen, Washington, D.C., for IU Intern. Oil & Gas Inc.

John F. Hayes, Hutchinson, Kan., William G. Riddoch, Houston, Tex., for Shell Oil Co.

James F. Flug, Washington, D.C., for State of Ala., Michigan, California.

Wayne Hundley, Deputy Atty. Gen., Topeka, Kan., Arthur J. Galligan, Washington, D.C., E. Dwight Taylor, Wichita, Kan., for States of Kan., Del., R.I., N.D., Ia., La. and Ala., Mich and Cal., W.Va.

Alexander B. Mitchell, Wichita, Kan., Jerry S. Cohen, Michael D. Hausfeld, Patricia F. Bak, Washington, D.C., for Independent Motor Gasoline Retailers, see dkt 279 for names of intervenors.

John A. Gibney, Jr., Richmond, Va., for intervenor Commonwealth of Va.

John R. Tarpley, Asst. Atty. Gen., Nashville, Tenn., for State of Tenn.

Richard P. Wilson, Asst. Atty. Gen., Columbia, S.C., for Georgia and South Carolina.

J. Wallace Malley, Jr., Jane Hart Marter, Asst. Attys. Gen., Montpelier, Vt., for State of Vt.

Claude E. Salomon, Deputy Atty. Gen., Div. of Law, Newark, N.J., for State of N.J.

Bernard Nash, Edward G. Modell, Blum & Nash, Washington, D.C., for States of Pa., Nev., Hawaii and Guam.

Jo Anne Sanford, Sp. Deputy Atty. Gen., Steven Bryant, Asst. Atty. Gen., Raleigh, N.C., for North Carolina.

Brad P. Engdahl, St. Paul, Minn., for Minnesota.

Frank J. Huftless, Asst. Atty. Gen., Lincoln, Neb., for Nebraska.

Frank W. Ostrander, Asst. Atty. Gen., Portland, Or., for Oregon.

Eduardo L. Buso, Asst. Atty. Gen., San Juan, P.R., for Puerto Rico.

Richard R. Knoepfel, Chief, Law Div., St. Thomas, U.S. V.I., for Virgin Islands.

William C. Primm, Paul Bardacke, Sante Fe, N.M., for New Mexico.

Inez Smith Reid, Corp. Counsel, Doreen E. Thompson, Stuart Cameron, Washington, D.C., for District of Columbia.

Richard L. Griffith, Asst. Atty. Gen., Denver, Colo., for Colorado.

Dennis M. Ryan, Asst. Atty. Gen., Boston, Mass., for Massachusetts.

Richard F. Webb, Asst. Atty. Gen., Hartford, Conn., for Connecticut.

Bruce E. Mohl, Asst. Atty. Gen., Concord, N.H., for New Hampshire.

Robert Frank, Asst. Atty. Gen., Augusta, Maine, for Maine.

Stanley B. Klimberg, Gen. Counsel, N.Y. State Energy Office, Albany, N.Y., Robert Abrams, Atty. Gen. of the St. of N.Y., New York City, for New York.

L.C. Ross, Denver, Colo., James W. Collier, Detroit, Mich., Robert Martin, Paul Swartz, Martin Bauer, Wichita, Kan., for Total Petroleum Inc.

Brian Grace, Wichita, Kan., Ralph J. Maynard, Houston, Tex., for Tenneco Oil Co.

John P. Mathis, Catherine C. Wakelyn, Washington, D.C., for Tenneco Oil Co. and Pennzoil Co.

Perry O. Barber, Houston, Tex., for Pennzoil Co.

Kenneth L. Bachman, Jr., Eugene M. Goott, Washington, D.C., Jeanette M. Thomas, Los Angeles, Cal., for Tosco Corp.

Thomas A. Donovan, Pittsburgh, Pa., Robert H. Compton, Kathleen C. Gillmore, Ashland, Ky., for Ashland Oil Inc.

Richard P. Noland, Robert R. Morrow, Monica A. Otte, Washington, D.C., for Texas City Refining Inc.

Brian Grace, Wichita, Kan., Van R. Boyette and Joseph C. Bell, Washington, D.C., for American Petroleum Refiners Ass'n.

Thomas D. Kitch, Wichita, Kan., Pillsbury, Madison & Sutro, San Francisco, Cal., for Chevron U.S.A. Inc.

James P. Zakoura, Kansas City, Kan., Robert L. Gowdy, Kansas City, Mo., for Farmland Industries, Inc.

Alphonse M. Alfano, Robert S. Bassman, Douglas B. Mitchell, Washington, D.C., Will Marson, Topeka, Kan., for Nat. Oil Jobbers Council.

Walter Davis, Asst. Atty. Gen., Energy Div., Austin, Tex., for Texas.

Marian Yoder, Asst. Atty. Gen., Cheyenne, Wyo., for State of Wyo.

David G. High, Deputy Atty. Gen., Boise, Idaho, for State of Idaho.

James F. Flug, Lee Ellen Helfrich, Lobel, Novins & Lamont, Washington, D.C., for State of Wyo., Idaho and Ind.

Frank Baldwin, Deputy Atty. Gen., Indianapolis, Ind., for State of Ind.

E. Dwight Taylor, Hulnick & Taylor, Wichita, Kan., Andrew P. Miller, Arthur J. Galligan, Peter J. Kadzik, Washington, D.C., for State of Utah.

## MEMORANDUM AND ORDER OF REFERRAL FOR FACT FINDING TO ADMINISTRATIVE AGENCY

THEIS, District Judge.

Like flies to honey, claimants are quickly drawn by a fund containing over one billion dollars. These claimants have radically differing notions as to how the fund should be distributed, with one factor common to all suggested approaches: each claimant, unsurprisingly, desires a methodology of distribution likely to result in a large percentage of the fund being deposited into said claimant's pockets. Now before the Court is a motion to refer the question of fund distribution to the Department of Energy's Office of Hearing and Appeals (OHA). Some of the parties wholeheartedly endorse this approach, others wholeheartedly oppose it, and others embrace it only as a fall-back position should the Court reject their contentions that the money should go immediately to them. Needless to say, all parties view this motion as extremely important, if the immense effort funneled into the voluminous briefs on this issue are an accurate gauge of the parties' perception of the importance of this motion.

This action is a consolidation of a number of cases brought by oil producers to enjoin the Federal Energy Administration (FEA), now the Department of Energy (DOE), from enforcing Ruling 1974–29, concerning low production oil wells, commonly called "stripper wells." The Court enjoined enforcement of the regulations in question, but ordered the oil producers to deposit into escrow the difference between the stripper well price and the controlled price of crude oil affected by the injunction. As of October 31, 1982, the escrow fund, including interest, contained over one billion dollars.

The issue of the validity of the regulations and Ruling was finally settled in *In Re The Department of Energy Stripper Well Exemption Litigation*, 690 F.2d 1375 (Em.App.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983), in which the Temporary Emergency Court of Appeals (TECA) reversed this Court's decision and upheld the rulings and regulations as valid. TECA remanded this action to this Court with instructions to enter judgment for DOE, which judgment has been entered. The effect of TECA's decision is to declare the funds deposited in escrow to be overcharges received due to violations of the petroleum pricing regulations. The remaining task is the appropriate dispensation of the escrowed funds—in effect a monumental interpleader action with potential classes and sub-classes.

The DOE has moved the Court to refer the issue of remedy to DOE pursuant to the doctrine of primary jurisdiction. DOE contends that the remedy issues are complex and are within the special competence of the agency. DOE states that the distribution of the various claims will require analysis of the ability of the claimant to pass through increasing costs and the extent to which such costs were actually passed through. DOE also notes that an analysis of the impact of the complex Entitlements Program and of the system of "banks" of increased costs will be required. DOE points out that it has already established a procedural mechanism for considering refund applications and that issues similar to those before the Court are presently being considered in refund actions before OHA. DOE contends that initial consideration by the agency, subject to review by the Court, will be more efficient than the Court conducting the entire factual inquiry itself.

Nearly every premise underlying the DOE's motion to refer has come under attack by other parties, which challenge both DOE's characterization of the remaining inquiry and DOE's competence and fairness to conduct it.

Plaintiff oil producers vigorously oppose the motion to refer. From their perspective, the remaining questions are mostly legal, not factual. They contend referral would, by implication, decide these legal issues and that the result would be contrary to what they view as controlling legal precedent. The principal legal contention advanced by producers is that it is improper to attempt to determine the actual damages beyond the refiner stage of distribution. In other words, the Court should not consider whether any overcharges were passed through by refiners to marketers and consumers. The basis of this contention is a line of precedent in antitrust law rejecting pass through theories and limiting recovery to first purchasers, with certain limited exceptions. *Hanover Shoe, Inc. v. United Machine Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). This approach has been applied to private enforcement actions brought under Section 210 of the Economic Stabilization Act. *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (Em.App.1979). Producers also contend that the OHA has failed to demonstrate either expertise or efficiency in its handling of refund claims. Producers further claim that OHA is not autonomous and has prejudged the issues in this case.

Finally, producers claim that referral is not appropriate because the pending issues are of the type within the Court's competence to address. Producers state that DOE can give the Court the benefit of its expertise by making recommendations to the Court by way of briefs.

Essentially similar positions are held by the first purchasers, refiners that actually purchased the petroleum in question. As presented in the brief filed by Total Petroleum, the first purchasers' position embraces the theory that *Hanover Shoe* and *Illinois Brick* preclude examination of passed through costs, and that the first purchasers are entitled to the entire amount of overcharges. The first purchasers contend that allowance of passed through recovery would subject the first purchasers to double liability if private parties sue them pursuant to Section 210 for the overcharges. The first purchasers argue that this is not a Section 209 action and is not a Section 210 action, but is analogous to a Section 210 action.

Not dissimilar contentions are advanced by the indicated refiners, who also oppose referral, reject pass through recovery by marketers and consumers, and question DOE's objectivity and competence. The key thrust of the indicated refiners' approach is that all refiners who participated in the Entitlements Program are eligible for recovery, and not just those who actually purchased the oil in question. This is required, contend the indicated refiners, because the Entitlements Program served to spread the overcharges equally among all participants in the Entitlements Program. In addition to opposing consideration of passed through overcharges on *Illinois Brick* grounds, the indicated refiners contend that overcharges were not passed on, because market conditions restricted what refiners could charge and thus the refiners bore the burden of the overcharges. The indicated refiners also contend that the forces of the market will force them to pass through the refunds they receive from the escrow fund in the form of reduced prices to ultimate consumers.

The intervening States argue that referral is unnecessary and contend that this Court should order distribution to the States as representatives of the ultimate consumers of petroleum products. The States rely on the recent opinion of Judge Flannery in *United States v. Exxon*, 561 F.Supp. 816 (D.D.C.1983), in which the Court ordered distribution to the States for use in programs designed to benefit petroleum consumers. The States argue that

review of the regulatory statutes shows that overcharges were passed along to the ultimate consumers and that it would be impossible to ascertain the precise damage borne by the ultimate victim. Thus, since DOE could not precisely determine losses suffered by particular claimants, the Court should, in the interests of restitution and equity, distribute the fund to the States, in proportion to their citizen's use of petroleum products during the controls period, for use in energy-related programs. To refer the case would, in the States' view, plunge the agency, the Court, and the escrow fund into an administrative quagmire.

The States argue, however, that if their proposal for immediate payout to the States is not endorsed by the Court, the motion to refer should then be granted. They argue that if the quagmire must be entered, DOE has the expertise and procedures to best accommodate the expedition. The States also contend that the Court can exercise supervisory control over the DOE to allay fears of bias and to insure prompt attention to the case.

Intervening purchasers have split on the issue of referral. The National Oil Jobbers Council (NOJC), a federation of 42 trade associations representing thousands of small petroleum marketers, favors referral. The NOJC contends that the Government has the duty to at least try to ascertain the identity of overcharge victims, and cites *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Em.App.1982) in support of this contention. The NOJC contends that there is no factual basis, in the absence of such an attempt, to conclude that none of the overcharge victims can be identified.

A number of other intervening purchasers, seeking to represent classes of gasoline retailers, trucking companies and electric utilities, oppose referral. They raise questions of agency bias and assert the Government is or may be trying to appropriate the funds for itself. They challenge DOE's competence and expertise and claim that referral will merely cause further delay in resolving this case. They raise the

possibility of the Court appointing a special master and generally contend that the distribution issue is within the Court's competence and province to resolve.

Consideration of the above questions leads the Court to conclude that two basic questions must be resolved before a decision on referral can be made:

1. Are any parties other than the first purchasers or participants in the Entitlements Program entitled to refunds?

2. Is it clearly impossible to ascertain particular harms suffered by particular parties by virtue of the overcharges?

If the first question is answered in the negative, then it must be asked: why refer? If the answer to the first question is affirmative, however, the second question becomes decisive. If it is clearly impossible to ascertain the impact of overcharges with particularity, does equity require that the fund be distributed in the public interest to the States, or to the Government standing in place of the ultimate consumers? The Court will now examine these questions in detail.

The key legal issue in deciding whether any parties other than first purchasers or participants in the Entitlements Program can recover is the applicability of *Hanover Shoe* and *Illinois Brick* to this case.

In *Hanover Shoe*, supra, the Supreme Court held that defendant in a private antitrust action could not assert the "passing on" defense that plaintiff shoe manufacturer suffered no legally cognizable injury because it increased the prices it charged its customers (i.e., it "passed on" the overcharges caused by defendant's illegal actions). The Court's reasoning on this issue is as follows:

"Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff

could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on' defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. On the other hand, it is not unlikely that if· the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

"In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* consumers. These ultimate consumers, in today's case the buyer of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing oⱥ monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court· has many times emphasized, would be substantially reduced in effectiveness."

*Hanover Shoe*, 88 S.Ct. at 2231–2232.

In *Illinois Brick*, supra, the Court concluded that the pass-on rule must be applied equally to plaintiffs and defendants, and held that only the direct purchasers, and not others in the chain of manufacture or distribution could recover for overcharges. As in *Hanover Shoe*, the Court emphasized both the complexity that pass-on theories entail and the resultant impairment of private antitrust enforcement. The Court noted:

"Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness."

*Illinois Brick*, 97 S.Ct. at 2070.

The Court also noted:

"The concern in *Hanover Shoe* for the complexity that would be introduced into treble-damages suits if pass-on theories were permitted was closely related to the Court's concern for the reduction in the effectiveness of those suits if brought by indirect purchasers suing for the full amount of the overcharge. The apportionment of the recovery throughout the distribution chain would increase the overall costs of recovery by injecting extremely complex issues into the case; at the same time such an apportionment would reduce the benefits to each plaintiff by dividing the potential recovery among a much larger group. Added to the uncertainty of how much of an overcharge could be established at trial would be the uncertainty of how that overcharge would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement."

*Illinois Brick*, 97 S.Ct. at 2074.

Based on *Hanover Shoe* and *Illinois Brick*, TECA has held that the passing on defense cannot be used in a private enforcement action under Section 210 of the Economic Stabilization Act. *Eastern Air Lines, Inc. v. Atlantic Richfield*, supra.

■ This Court does not believe the rationale of *Hanover Shoe* and *Illinois Brick* is applicable, however, in this action. This action is fundamentally different from a private enforcement action under the Antitrust Laws or under Section 210 of the

Economic Stabilization Act. In this action, oil producers sought declaratory judgments to forestall government enforcement of overcharge violations under Section 209. Preliminary injunctive relief was granted, conditioned on the oil producers paying the alleged overcharges into escrow. The Court now considers this action to be, in effect, a Government enforcement action in which the fact of overcharge has been determined and the Court is now faced with effecting restitution.

In the Court's view, the difficulty in computing passed on costs and the subsequent adverse effect on antitrust enforcement were inextricably bound together in *Hanover Shoe*. In that case the Court found that addition of pass-on issues to already protracted private antitrust suits would seriously hamper the scheme of private enforcement of the antitrust laws. In *Illinois Brick*, the Court was faced with the problem of whether to permit offensive use of pass-on theories after defensive use had been barred by *Hanover Shoe*. The Court declined to allow offensive use, repeatedly emphasizing the adverse impact on private antitrust enforcement that pass-on theories would entail. As one commentator noted:

> "The *Illinois Brick* result apparently rests on the proposition that a rule allowing all purchasers to recover would so reduce the incentives for direct purchasers to bring suit that while there might be some enforcement gains at the indirect purchaser level, the total number of suits would decline."

*The Supreme Court, 1976 Term*, 81 Harv. L.Rev. 72, 226 (1977).

In this case no such fears are applicable. There is no private enforcement involved, and thus, no incentive to encourage private suits by disallowing pass-on theories. On that ground alone, the *Hanover Shoe—Illinois Brick* doctrine is inapplicable to an action under Section 209 or an action, such as this one, closely analogous to a Section 209 action. While *Hanover Shoe* and *Illinois Brick* may be suitable for Section 210 actions, it must be noted that the objectives of Section 209 differ significantly from

those of Section 210. Section 210 provides for private suits seeking damages. Section 209 provides for Government action in which the Court may order restitution.

In Section 209, Congress gave the courts "equitable power ... to set things right and order restitution." S.Rep. No. 92–507, 92nd Cong., 1st Sess. reprinted in 2, 1971 U.S.Code Cong. & Ad.News 2283, 2291, quoted in *Sauder v. Department of Energy*, 648 F.2d 1341 (Em.App.1981). In *Sauder*, TECA made clear that restitution, as provided in Section 209, is fundamentally an equitable concept. The Court quoted *Moore's Federal Practice* Vol. 5, ¶ 38.24[2], stating:

> "In equity, restitution is usually thought of as a remedy by which defendant is made to disgorge illgotten gains or to restore the status quo or to accomplish both objectives." 648 F.2d at 1348.

TECA approved an action which did not seek damages, "which may or may not be the amount of the overcharge," but sought restitution. TECA also made it clear that the Court's equitable power is broad:

> "There is no indication ... that the section thereby attempts to limit the power of the courts or the agency to restitution or to a particularly strict interpretation of restitution."

*Sauder*, 648 F.2d at 1348.

■ Restitution seeks to restore the status quo but, if that is not possible because the status quo has been permanently altered, restitution seeks to provide other kinds of compensation. See *Restatement of Restitution*, § 1, comment a (1937).

Thus, the restitutionary nature of Section 209 and of this action differ fundamentally from the damages remedy of Section 210 and of the Antitrust Laws. For this additional reason, the *Hanover Shoe* and *Illinois Brick* cases do not apply to this action. This was also recognized by the District Court in *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 (S.D. Ala.1980), *rev'd on other grounds*, 669 F.2d 717 (Em.App.1982), which rejected attempts to bar consideration of pass-on con-

sequences. Referring to *Hanover Shoe* and *Illinois Brick*, the Court stated:

"The policies underlying those cases are largely inapplicable to enforcement actions by the government, and restitutionary relief by its nature does not have some of the difficulties which arise in actions for damages.

"In an enforcement action, there is no danger that the incentive to enforce the law will be reduced by permitting indirect purchasers to recover."

499 F.Supp. at 884.

The Court would also note that the fundamental difference in and independence of the 209 and 210 remedies were recognized by TECA in *Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278 (Em.App.1980).

The first purchasers have also raised the spectre of potential double liability if pass through is allowed and they are then subject to a private enforcement action under Section 210. It has been recognized, however, that both private and public remedies may be applied to the same violation. *Bulzan v. Atlantic Richfield Co.*, supra. In *Bulzan*, TECA noted a number of solutions to the multiple liability problem, stating that one solution is adjudication of a liability action under Section 210 "to take into account a prior or subsequent" restitution award. *Bulzan*, at 283–284. The spectre of double liability was similarly dispelled in *U.S. Oil Co., Inc. v. Koch Refining*, 518 F.Supp. 957 (E.D.Wis.1981); *Martin Service v. Koch Refining Co.*, Unpub. No. 81–1844 (E.D.Ill., Oct. 18, 1982); *Ray L. Hunt v. Department of Energy*, Unpub. No. CA–3–78–02440–W (N.D.Tex. July 25, 1983).

Since considerations of equity are so vital in restitution, the Court must note that allowing first purchasers to retain all of the overcharges, particularly in the absence of a factual showing that they did not pass on some or all of the overcharges, would not be an equitable result. This is particularly true when the first purchasers' proposed remedy would result in most of the overcharges being returned to plaintiffs in this action, who were the parties responsible for and who attempted to benefit from the overcharges in the first place. At this stage of the proceedings, there are no facts to show that this would not be an inequitable windfall to the first purchasers or indicated refiners.

Having concluded that recovery is not limited to first purchasers or the participants in the Entitlements Program, the Court must now consider whether it is clearly impossible to ascertain with particularity the parties that bore the burden of the overcharges. The States argue that such a task is clearly impossible and, relying on Judge Flannery's opinion in *United States v. Exxon*, supra, contend that the States should receive the escrow fund for use in programs aiding energy consumers.

The Court tends to agree with the States and with Judge Flannery that it is likely that the ultimate consumers of petroleum products bore the brunt of these overcharges and that it will be impossible to determine otherwise. If this is the case, the Court believes that the equitable goals of restitution would mandate distribution to either the state governments or the federal government for use in programs designed to aid energy consumers. Such a distribution would be akin to the *cy pres* doctrine in the legal field of charitable trusts where, when it is impossible to carry out the specific intent of the testator, courts dispose of the funds in the "next best" manner. Such a doctrine has been extended to the distribution of funds in class action and overcharge cases and, where it is impossible to specifically identify the proper claimants, allows the funds to be used in a manner designed to benefit the claimants as a class. See *Note, Collecting Overcharges from the Oil Companies: The Department of Energy's Restitutionary Obligation*, 32 Stan.L.Rev. 1039 (1980).

This approach was most notably applied in *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970); *aff'd.*, 440 F.2d 1079 (2nd Cir.1970), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). This was a nationwide antitrust class action against drug companies accused of price

fixing brought by 37 states on behalf of consumers. Pursuant to a court-approved settlement, a fund of 37 million dollars was administered for refunds to individual consumers, but application of a claim procedure still left 32 million dollars in the fund. This was distributed to states for use in public health programs. A similar rationale underlay Judge Flannery's remedial action in *United States v. Exxon*, supra, in which the overcharges were placed in an escrow account for distribution to the states for use in energy conservation programs.

Likewise, a direct refund to the United States treasury would serve equitable and restitutionary goals. While such a remedy would not aid energy consumers as directly as refund to the states for use in energy programs, it would have certain advantages. It would involve virtually no administrative expense and would benefit the public at large by increasing federal revenues. Since mobile transportation is an all-encompassing way of life in our nation, those injured may well be the public at large. Hence such a distribution would probably serve the purpose of aiding the injured party. It would also, of course, fulfill the restitutionary goal of requiring plaintiffs to disgorge their judicially-determined illegal gains. See *Note, Refunding Overcharges Under the Emergency Petroleum Allocation Act: The Evolution of a Compensatory Obligation*, 79 Mich.L.Rev. 1454, 1473 (1981).

■ The Court reaches no conclusion as to what remedy would be the most efficacious or equitable, but merely points out that equitable remedies do exist in the absence of proof as to the particulars of the burden of the overcharges. The Court believes, however, that an attempt must be made to determine if particular harm can be shown and that Judge Flannery's resolution in *Exxon* was premature. The Court believes this approach is required by TECA in light of *Citronelle-Mobile Gathering Co. v. Edwards*, supra, where the Court concluded:

"The Government has a *duty* to try to ascertain those overcharges, and refund them, with interest, from the restitutionary funds."

669 F.2d at 723.

The Court would note that it has before it no *facts* at this time which could establish that it is impossible to identify at least some of the injuries caused by the overcharges. For the Court to conclude that impossibility at this time would be a too-hurried retreat from the objective of restitution to most nearly restore the status quo and return to those overcharged the amount of their loss.

Having reached that conclusion, the Court must reject the request of the States for immediate distribution to them. The Court has thus rejected various claims for immediate distribution and concluded that an attempt must be made to identify those harmed by the overcharges. The basic question remaining is whether this issue should be referred for fact-finding to the OHA of the DOE.

■ Where the claim before the Court requires the resolution of issues which, under a regulatory scheme, are placed within the purview of an administrative agency, the doctrine of primary jurisdiction may be applied to suspend the judicial process pending referral of such an issue to the administrative agency. *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). In the *Western Pacific* case, the Supreme Court noted:

"[i]n cases raising issues of fact not within the conventional expertise of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over."

77 S.Ct. at 165.

The Supreme Court has emphasized that referral is useful when uniformity and consistency is important and where technical questions of fact within the expertise and the experience of the agency exist. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290,

96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Referral is also desirable when one compares the flexibility or agency procedures with the rigidity too often characteristic of court procedures. *Sunflower Electric Coop. v. Kansas Power & Light Co.*, 603 F.2d 791, 795 (10th Cir.1979). The doctrine is best summarized in fn. 14 of *Columbia Gas Transmission v. Allied Chemical Corp.*, 652 F.2d 503 (5th Cir.1981), wherein it is stated at 519:

> "It is a discretionary tool of the courts, a flexible concept to integrate the regulatory functions of agencies into the judicial decision making process by having agencies pass in the first instance on technical questions of fact uniquely within the agency's expertise and experience, or in cases where referral is necessary to secure uniformity and consistency in the regulation of business, such as issues requiring the exercise of administrative discretion."

■ In the Court's view, the tracing of overcharges involves complicated and technical questions of fact, compounded by the impact of regulatory phenomena such as the Entitlements Program and the "banking" of costs. The OHA has developed procedures for refund claims in overcharge cases and is better equipped than the Court to make preliminary findings concerning the particular impact of overcharges on various parties.

Opponents of referral have pointed to the rather rocky beginning OHA experienced in developing refund procedures, but it appears that OHA has now made significant progress in implementing such procedures. See *Office of Enforcement*, 9 DOE ¶ 82,521 (hereinafter Alkek); *Office of Enforcement*, 9 DOE ¶ 82,553 (hereinafter Adams), which show that OHA is progressing with large refund proceedings. The agency has established a mechanism for considering applications for refunds, known as Subpart V procedures.

The Court believes that the large number of technical questions involved in attempting to determine the allocation of the burden of overcharges in the thicket of the regulatory scheme could more efficiently be addressed before the OHA. The Court does share the concern of the parties who have noted that OHA has not been as efficient at handling claims as might be hoped. The Court will therefore retain jurisdiction over this case and require regular progress reports from the Department on its handling of the referred matters in this case.

The Court is also aware of the concern of some parties of DOE bias in this case, and notes that the Department has not taken a position on what the final disposition of the escrowed funds should be. Positions of the DOE in other actions concern some parties. The Court emphasizes that he is referring to the DOE only the factual question concerning the particularized impact of the overcharges. The Court is specifically retaining jurisdiction and will make the final determination of the disposition of the funds. The Court, not the DOE, will decide where the funds go. The Court does believe, however, that the OHA's claim process and DOE's acquired expertise, will assist the Court in developing the facts needed for an equitable disposition of the funds.

■ The Court notes that it can retain jurisdiction of this matter while referring only limited factual questions to the agency. See *Israel v. Baxter Laboratories*, 466 F.2d 272 (D.C.Cir.1972); *Danville Tobacco Assoc. v. Bryant-Buckner Associates, Inc.*, 333 F.2d 202 (4th Cir.1964). The Court is retaining jurisdiction of this action, and is merely suspending its consideration of the issues in this case in order to allow OHA to attempt to determine with particularity the tracing and impact of the overcharges or any portion of them in this case.

The Court is therefore referring to the Office of Hearing and Appeals of the Department of Energy the task of attempting to determine what parties bore the cost of the overcharges and in what amounts. The Court will also welcome the views of the OHA on how restitution can best be achieved in this case. The Court, however, is retaining jurisdiction over both this action and the escrow fund. No determina-

tion of restitution nor payout from the escrow fund may be ordered by the OHA, as such matters remain within the province of this Court.

The Court also orders OHA to make an interim report to the Court within six months of the date of this order, and a final report to the Court within one year from the date of this order, regarding the extent of its progress in determining the questions referred. The Court realizes that these matters are complex and that considerable time may well be needed for OHA to complete its assigned task. Nevertheless, the Court would expect substantial progress in one year, and emphasizes that this is MDL litigation deserving the utmost expedition. If substantial progress is not made, OHA is ordered to provide detailed explanation of why progress has been lacking. A lack of progress and the reasons therefore may indicate to the Court that the process is futile and may require the Court to take equitable action as noted elsewhere in this opinion. On the other hand, the Court may determine that more time and a greater effort on the part of OHA is all that is required. These issues will be explored by the Court after receipt of OHA's reports.

IT IS THEREFORE ORDERED AND ADJUDGED that the Department of Energy's motion to refer is granted, with the following conditions:

1. This Court retains jurisdiction over this action and over the escrow fund. All decisions concerning restitution and payout from the fund are reserved to this Court for judicial resolution.

2. The Department of Energy's Office of Hearings and Appeals is ordered to conduct factfinding pursuant to its regulatory process concerning the particularized tracing and impact of the overcharges at issue in this case. The DOE is ordered to make an interim report to this Court within six months of the filing of this order, and a final report within one year from the date of this order, concerning its progress in such factfinding.

3. All parties with claims on the escrow fund in this case shall submit specific proof thereof to the OHA consistent with the regulatory process established by that agency.

4. The Court will suspend its consideration of this action, pending OHA's reports to this Court, or until further order of the Court. The Court will hold in abeyance all pending motions until that time, including motions to intervene or to certify class actions.

IT IS FURTHER ORDERED, for the reasons set forth in the foregoing memorandum, that the motions of Total Petroleum and Farmland Industries for immediate distribution from the escrow fund are hereby denied.

On Motion to Certify Constitutional Issues

On September 13, 1983, this Court referred the issue of the appropriate remedy in this multidistrict litigation to the Office of Hearings and Appeals [OHA] of the Department of Energy [DOE], with instructions to the OHA to report in March and September of 1984 on its progress. The relief afforded to the Court by this referral has, however, been short-lived. The case is once more before the Court on a hotly contested and heavily briefed motion. The plaintiffs, various oil producers, have moved this Court to certify three constitutional issues concerning one house legislative vetoes in the Emergency Petroleum Allocation Act [EPAA] and the Energy Policy and Conservation Act [EPCA] to the Temporary Emergency Court of Appeals [TECA] for consideration in light of the United States Supreme Court's recent declaration that one-house legislative vetoes are unconstitutional, *see Immigration and Naturalization Service v. Chada,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Numerous parties, including the DOE, intervening states, and intervening purchasers, hereinafter collectively referred to as the defendants, are bitterly opposed to any certification. For the reasons that follow, this Court believes that substantial consti-

tutional issues exist in this case, and that those constitutional issues must be certified to TECA, *see* § 211(c) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note.

## I.  Brief Factual and Procedural Background

This action was originally brought by an individual plaintiff to enjoin the DOE and its predecessor, the Federal Energy Administration, from enforcing Ruling 1974–29, which concerned low-production oil wells commonly referred to as "stripper wells." This Court enjoined enforcement of the Ruling, but required the plaintiffs to deposit into an escrow account the difference between the higher stripper well price the injunction permitted them to receive and the lower controlled crude oil price they would otherwise have received. This escrow fund currently contains approximately eight hundred million dollars.

Unfortunately, this litigation has tread a rocky road to arrive at the present motion. First, this Court concluded that Ruling 1974–29 was void, *Energy Reserves Group, Inc. v. Federal Energy Administration,* 447 F.Supp. 1135 (D.Kan.1978). This conclusion was reversed by TECA in a two-to-one decision, and the case was remanded for trial, *Energy Reserves Group, Inc. v. The Department of Energy,* 589 F.2d 1082 (Em.App.1978). Numerous other cases concerning the same issue were collected around the country and consolidated here as multidistrict litigation in June of 1979, *In re The Department of Energy Stripper Well Exemption Litigation,* 472 F.Supp. 1282 (Jud.Pan.Mult.Lit.1979). After a brief second sojourn at TECA in which the DOE unsuccessfully attempted to obtain a writ of mandamus against this Court, *Duncan v. Theis, Chief Judge,* 613 F.2d 305 (Em. App.1979), the case was finally tried in early 1981.

After the trial, this Court concluded that Rule 1974–29 was arbitrary, capricious, and contrary to the expressed intent of Congress, *In re The Department of Energy Stripper Well Exemption Litigation,* 520 .

F.Supp. 1232 (D.Kan.1981). The case was then taken to TECA for the third time, and TECA once again reversed, *In re the Department of Energy Stripper Well Exemption Litigation,* 690 F.2d 1375 (Em. App.1982), *cert. denied,* — U.S. —, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). The final section of TECA's opinion reads as follows:

### Conclusion

In summary, we find:

1) The legislative history of the stripper well exemption amply supports the DOE's position that injection wells were not intended by Congress to be included in the well count;

2) Ruling 1974–29 is not beyond the authority of the DOE granted by the controlling statutory provisions;

3) Our prior decision in *Energy Reserves I, Duncan v. Theis* and *Wiggins* have correctly decided that Ruling 1974–29 is a reasonable interpretation of the applicable statutes and regulations; and

4) The stripper well regulations, as interpreted by Ruling 1974–29, are neither arbitrary nor capricious.

For all these reasons, the decision of the district court is reversed, and these consolidated cases are remanded to the district court with instructions to enter judgment for the [defendants].

*Id.* at 1392. In accordance with TECA's instructions, judgment was entered for the DOE on February 14, 1983, *see* Dk. No. 282, in the following words:

IT IS THEREFORE ORDERED that judgment is hereby rendered in favor of defendants and against plaintiffs, in accordance with the mandate of the Temporary Emergency Court of Appeals filed herein on September 20, 1982.

Dk. No. 282, at 2. As the Court stated in its Order of September 13, 1983.

The remaining task is the appropriate dispensation of the escrowed funds—in

effect a monumental interpleader action with potential classes and sub-classes. 578 F.Supp. at 589.

After hearing from the various parties and intervenors at extraordinary length, this Court concluded that the most expeditious method of proceeding was for this Court to retain jurisdiction over both the case and the escrowed funds while referring the factfinding as to who bore the brunt of the overcharges to the OHA, 578 F.Supp. at 596–97.

On November 14, 1983, the plaintiffs moved to certify three constitutional issues to TECA, to vacate the referral of factfinding to the OHA, and to release the escrowed funds. The three constitutional issues are stated by the plaintiffs as follows:

1) Whether the Emergency Petroleum Allocation Act, as amended, must be declared unconstitutional, *ab initio*, because it contains an invalid and inseverable one-house legislative veto provision that was twice utilized to the detriment of plaintiffs.

2) Whether the Oil Pricing Policy added as section 8 to the Emergency Petroleum Allocation Act by section 401 of the Energy Policy and Conservation Act must be declared unconstitutional, *ab initio*, because it contains three invalid and inseverable one-house legislative veto provisions and imposed price controls to the detriment of plaintiffs.

3) Whether MDL No. 378 must be dismissed for lack of subject matter jurisdiction in view of the constitutional invalidity of the Emergency Petroleum Allocation Act, as amended, and section 401 of the Energy Policy and Conservation Act.

Memorandum in Support of Plaintiffs' Motion, Dk. No. 520, at 1–2. The Court heard extensive oral argument on the motions on Monday, January 16, 1984, and is now ready to rule.

## II. Preliminary Issues

No one disputes that the *Chada* decision declared one-house legislative vetoes to be an unconstitutional infringement of the Article I requirements of bicameralism and presentment. Instead, the defendants present four essentially procedural arguments in support of their basic assumption that the plaintiffs cannot raise their constitutional challenge at this juncture. The defendants assert that: (1) the motion to certify the constitutional issues is inexcusably tardy; (2) the plaintiffs are without standing to raise the constitutional challenge; (3) the legislative vetoes in the EPAA and EPCA are, in any event, severable from the remainder of the acts; and (4) retroactive application of *Chada* would be inequitable. The Court will deal with these assertions in the order listed.

## (1) Timeliness

The defendants first argue that the plaintiffs' motion is inexcusably tardy because judgment has already been entered in this case, *see* Dk. No. 282, and because Rule 60 of the Federal Rules of Civil Procedure provides no mechanism whereby that judgment may be modified. This argument proceeds from the erroneous assumption that a *final* judgment has been entered in this case.

■ Rule 54(b) of the Federal Rules of Civil Procedure explicitly states that

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all of the parties.

The judgment entered on February 14, 1983, Dk. No. 282, is on its face not a final order. The rights and liabilities of the plaintiffs, the defendants, and the numerous intervenors simply were not finally adjudicated by that order. No disposition of the huge escrow fund was made, and all parties still maintain their entitlement to that fund. The Court, in fact, unequivocally expressed its understanding that no final judgment was entered when it *expressly retained jurisdiction over the case and the escrow fund* while referring the fact-finding mission to the OHA. Such retention would have been nonsensical had a final judgment adjudicating all the claims and the rights and liabilities of all of the parties been entered seven months earlier. Additionally, the substantial factfinding presently being conducted by the OHA and the difficult question remaining for the Court of who gets the money make any notion of finality in this case untenable at this time. Because the question of who gets the money is unresolved, and because a decision that the EPAA and EPCA are unconstitutional could have a major impact on the resolution of that question, this Court believes that the plaintiffs' motion to certify the constitutional issues is timely.

### (2) Standing

■ The essence of the standing challenge is the supposed lack of injury from an exercise of the concededly unconstitutional one-house vetoes. The short answer to this argument is that the plaintiffs allege that the EPAA and EPCA must be declared void *ab initio* because of the one-house vetoes, and that the money presently in the escrow fund must, therefore, be restored to the plaintiffs because it was exacted from them under unconstitutional acts. Clearly, the exaction of large sums of money under unconstitutional acts is an injury, that injury is traceable to those acts, and that injury could be redressed by a declaration that the acts are unconstitutional and that the money should be returned to the plaintiffs, *see, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). This Court believes that the plaintiffs have a sufficient "personal stake in the outcome of this controversy to warrant [their] invocation of federal court jurisdiction and to justify exercise of the Court's remedial powers on [their] behalf," *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 260–61, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977); *Holly Sugar Corp. v. Goshen City Cooperative Beet Growers Association,* 725 F.2d 564, 567–68 (10th Cir.1984). The plaintiffs therefore have standing to assert their constitutional challenge.

### (3) and (4) Severability and Retroactivity

■ The Court will consider these two assertions together because a similar analysis applies to both. As a preliminary matter, it must be remembered that this Court lacks jurisdiction to determine the constitutional validity of any provision of the EPAA or EPCA, or of the regulations under those Acts, inasmuch as exclusive jurisdiction over those issues is vested in TECA and the United States Supreme Court by way of appeal, see § 211(g) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. If *any* substantial constitutional issue exists, it *must* be certified to TECA, see *id.* § 211(c).

■ These restrictions on this Court's jurisdiction and power are relevant to the defendants' final two assertions because those assertions invite this Court to reach the merits of the constitutional challenge, albeit indirectly. Were this Court to conclude that the concededly unconstitutional one-house vetoes are severable from the remainder of the Acts, the Court would also be concluding that the remainder of the Acts passes constitutional muster, despite the plaintiffs' vigorous assertion that the Acts must be declared void *ab initio.* Likewise, a decision that *Chada* will not be applied retroactively to this litigation would be tantamount to a declaration that the price controls are constitutionally sound

enough to be enforced by the final judgment this Court must eventually enter disbursing the escrowed funds. Both of these inquiries are so firmly intertwined with the merits of the constitutional challenge as to be inseverable from it and, therefore, outside this Court's jurisdiction and power to hear.

The parties have briefed these issues with their customary professionalism and attention to detail, and their lengthy citations to the case law and the legislative histories of the Acts have demonstrated that each side has a substantial argument and that the question is indeed a close one. This demonstration has helped to convince this Court that the constitutional issues raised by the plaintiffs are substantial, and that those issues must, therefore, be certified to TECA.

### III. Certification

IT IS THEREFORE ORDERED that the three constitutional issues raised by the plaintiffs and set out verbatim in this Memorandum and Order, *supra* p. 599, be certified to the Temporary Emergency Court of Appeals.

IT IS FURTHER ORDERED that the plaintiffs' motions to vacate the referral of factfinding to the OHA and to release the escrowed funds be held in abeyance pending TECA's resolution of the constitutional issues.

IT IS FURTHER ORDERED that OHA continue uninterrupted with its factfinding mission.

IT IS FURTHER ORDERED that this Court retain jurisdiction over this case and over the escrowed fund to the maximum extent consistent with the certification of constitutional issues to TECA.