Robert C. MULLINS, et al., Plaintiffs,

v.

UNITED STATES DEPT. OF ENERGY, et al., Defendants.

Civ. A. No. 90–0108–P(H).

United States District Court,
W.D. Kentucky,
at Paducah.

May 24, 1993.

Roger W. Perry, Long & Perry, Benton, KY, Len W. Ogden, Jr., Paducah, KY, for plaintiffs.

Scott C. Cox, U.S. Attys. Office, Louisville, KY, Don W. Crockett, Thomas W. Sacco, Ralph C. Oser, Dept. of Energy, Judicial Litigation Div., Economic Regulatory Admin., Washington, DC, for defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This case comes before the Court on cross-motions for summary judgment. Plaintiffs, owners of Texaco service stations, seek a declaratory judgment against the Department of Energy and other agency officials challenging the agency's final action on the implementation of special refund procedures for the disbursement of $1.198 billion that the agency secured from Texaco, Inc. in settlement of agency enforcement actions. Plaintiffs, who would be entitled to restitution from the settlement as purchasers of Texaco's allegedly overpriced refined petroleum products, claim that the agency's allocation of $120 million (10% of the settlement amount) to the Texaco refined products refund pool violates agency regulations, 10 C.F.R. § 205.282(e), and deprives them of property in violation of the due process clause of the Fifth Amendment. For the reasons stated below, the Court will not disturb the agency action.

## I. ADMINISTRATIVE POSTURE

In the advent of the energy crisis of the seventies, the Department of Energy ("DOE") regulated the prices of crude oil and refined petroleum products (e.g., gasoline, home heating fuel) from August 1973 through January 1981.[1] An enforcement agency within the DOE, the Economic Regulatory Administration ("ERA"), conducted compliance investigations by auditing major oil refiners including Texaco, Inc. ("Texaco"). Having determined that there was basis to believe that Texaco was not in compliance with agency price controls,[2] the ERA initiated several enforcement proceedings by serving notices of pricing violations and proposed remedial orders.[3]

Given that these compliance proceedings were still pending as late as 1988, the ERA and Texaco entered into extensive settlement negotiations finally resolving the enforcement action with a consent order.[4] The con-

---

1. The DOE derived regulatory authority to stabilize domestic oil shortages under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754, which incorporates the enforcement scheme of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note.

2. Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212 (1993).

3. These enforcement procedures, among others, are set forth in 10 C.F.R. Part 205, Subpart O.

4. The DOE's final action on the settlement agreement with Texaco involved no procedural defects. In accordance with 10 C.F.R. § 205.-199J(c), the ERA published notice of the Proposed Consent Order with Texaco, Inc., 53 Fed. Reg. 15,106 (1988), and following a thirty-day

sent order resolved both discovered and undiscovered overcharges, estimated at more than two billion dollars, for the period of January 1, 1974 through January 27, 1981, only months shy of the very duration of the price controls. Texaco agreed to remit $1.25 billion plus interest in several installments over a five year period beginning in September, 1988. Included in the consent order was a $52 million settlement payable to an escrow account maintained by a Kansas district court,[5] thus leaving a sum of $1.198 billion payable to the DOE. Those persons injured by Texaco's overcharges would be entitled to restitution from this settlement. *See* 10 C.F.R. § 205.280 (1993).

The ERA petitioned, thereafter, another DOE agency, the Office of Hearings and Appeals ("OHA"), to implement special procedures[6] for the distribution of refunds to persons injured by the effects of the regulatory violations. In accordance with agency regulations,[7] the OHA published Notice of Implementation of Special Refund Procedures[8] setting forth the standards and procedures that it intended to apply in the disbursement of the Texaco settlement funds. Because the consent order resolved both crude oil and refined products price control violations, agency policy required the division of the settlement into two refund pools.[9] The consent order did not, however, entail a specific agreement about the apportionment between the crude oil and refined products

violations. Accordingly, the OHA proposed allocating $1.078 billion (90%) to a crude oil refund pool and $120 million (10%) to a refined products refund pool.

This 90%–10% apportionment had been the subject of public comment before the ERA during its proposed action on the consent order. Although essentially discounting this opposition, the ERA deferred final resolution of the apportionment issue to the OHA. The OHA found the ERA's assessment persuasive and likewise rejected comments in support of either increasing or decreasing the allocation ratio. Pursuant to agency regulations,[10] therefore, the OHA established the 90%–10% apportionment standard in a final action, the Implementation of Special Refund Procedures.[11]

## II. JUSTICIABLE CONTROVERSY

The OHA's final action is the subject of Plaintiffs' challenge. Just as refined-products interests argued before the ERA and the OHA, Plaintiffs contend that the refined products refund pool should comprise 16% ($200 million) rather than 10% ($120 million) of the Texaco settlement. Plaintiffs argue for a 16% allocation on the basis of the ERA's enforcement negotiations with Texaco. At the time it proposed resolving its enforcement proceedings pending against Texaco, the ERA estimated Texaco's maximum liability to total $2.174 billion, attribut-

period for public comment and a public hearing for oral argument, the ERA published the Final Consent Order with Texaco, Inc., 53 Fed.Reg. 32,929 (1988) (modifying ¶ 203 of the Consent Order).

5. In an action of consolidated multi-district cases, several oil producers sought to enjoin the DOE's narrow interpretation and enforcement of regulations exempting from price controls low production oil wells, commonly called "stripper wells." *See In re The Dep't of Energy Stripper Well Exemption Litigation,* 578 F.Supp. 586, 589 (D.Kan.1983). The district court enjoined the DOE but ordered the oil producers to deposit into escrow the difference between the stripper well price and the controlled price. Reversing the district court, the Temporary Emergency Court of Appeals ruled that the escrowed funds constituted overcharge proceeds. *Id.* The DOE's Consent Order with Texaco, Inc. includes a resolution of Texaco's alleged deficiency in the escrow account for a sum of $52 million.

6. Subpart V proceedings are applicable to the distribution of refunds when the ERA cannot readily identify injured persons or readily ascertain the amount to which those persons are entitled. 10 C.F.R. § 205.280 (1993).

7. 10 C.F.R. § 205.282(a), (b) (1993).

8. 54 Fed.Reg. 13,420 (1989).

9. *See* Modified Restitutionary Policy in Crude Oil Cases, 6 Energy Management (CCH) ¶ 90,508A (August 11, 1986); *see also* Notice Explaining Procedures for Processing Refund Applications in Crude Oil Refund Proceedings under 10 C.F.R. Part 205, Subpart V, 52 Fed.Reg. 11,737 (1987).

10. 10 C.F.R. § 205.282(c), (d) (1993).

11. 54 Fed.Reg. 31,569 (1989).

ing 84% to crude oil violations and 16% to refined products violations. Ultimately, the ERA and Texaco compromised a $1.25 billion settlement, which included a $52 million settlement of litigation pending in another district court.[12] Rather than applying the estimated 84%–16% apportionment of liability, however, the ERA recommended that the OHA commit 90% (1.130 billion) to a crude oil refund pool and 10% (120 million) to a refined products refund pool. The OHA finally adopted the 90%–10% apportionment in reliance on the ERA's assessment, notwithstanding objection raised during the public comment period.

The significance of a 10% allocation rather than a 16% allocation is by no means obvious since the alleged injury in this case is not merely whether $120 million is sufficient to satisfy all refined products claims. Plaintiffs claim that the agency action deprived them of full restitution due to an agency policy providing for the calculation of refunds pursuant to a mathematical formula in which the allocation amount is a numerator. For refined products claimants seeking a refund of $10,000 or less, the DOE accords a presumption of injury from crude oil overcharges upon proof of the volume of petroleum product purchases. Accordingly, the agency calculates refunds from the refined products pool by what is termed the "volumetric approach."

Under this approach, a claimant's refund is equal to the number of gallons purchased during the period in question multiplied by a per-gallon or "volumetric" refund amount. To determine the volumetric factor, the refund pool amount, in this case $120 million, is divided by the number of gallons of petroleum products that Texaco sold during the period in question, in this case 105,590,045,-

356. Under a $120 million allocation, therefore, the volumetric is .0011 per gallon.

Due to the volumetric factor, however, a greater allocation to the refined products refund pool would result in a greater restitutionary award per claimant. If the OHA had apportioned $200 million to a refined products refund pool, the volumetric would be .0018 per gallon. Under a 16% allocation, therefore, Plaintiffs would be entitled to $.0007 more per gallon than under a 10% allocation.

Since the OHA established a 10% allocation without procedural defect, Plaintiffs advance a substantive challenge. Plaintiffs claim that the 10% allocation is an inequitable distribution in violation of 10 C.F.R. § 205.282(e) and a deprivation of property in violation of the due process clause of the Fifth Amendment.

## III. JUDICIAL REVIEW

■ The review of final agency action in this case is limited to a rational basis standard.[13] Congress restrained judicial intervention in these cases to those agency actions based upon findings that are not supported by substantial evidence. *See* Economic Stabilization Act of 1970, § 211(d)(1), 12 U.S.C. § 1904 note (1989).[14] This "substantial evidence" standard, however, does not require preponderate evidence but, rather, requires "enough evidence to demonstrate that the agency's conclusion was not unreasonable." *Pratt v. Watkins,* 946 F.2d 907, 909 (Temp.Emer.Ct.App.1991).[15] Under this standard, the DOE's decision should stand if there is a rational basis for it. *Thriftway Co. v. United States Dep't of Energy,* 867 F.2d 1577, 1580–81 (Temp.Emer.Ct.App.1989).

Judicial deference recognizes the expertise of an agency decision-maker as well as the

---

**12.** See *supra* note 5.

**13.** On an appeal from the dismissal of the Complaint, the Temporary Emergency Court of Appeals reversed and remanded stating in its Opinion the standard of this Court's review. *Mullins v. United States Dept. of Energy,* 964 F.2d 1149 (Temp.Emer.Ct.App.1992).

**14.** For the text of § 211(d)(1), see Economic Stabilization Act Amendments of 1971, Pub.L. No.

92–210, § 2, 85 Stat. 743 *reprinted in* 1971 U.S.Code & Admin.News 837, 844–45.

**15.** The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754, incorporates by reference the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, which created a Temporary Emergency Court of Appeals with exclusive jurisdiction to hear appeals from district courts in these cases.

limitations of the judicial administration of complex administrative programs. *Id.* The Temporary Emergency Court of Appeals explained:

> [A] reviewing court must determine whether the decision of the agency was based on a consideration of the relevant facts, whether there was a clear error of judgment, and whether the agency has articulated a rational connection between the facts found and the choice made.... [U]nder the arbitrary and capricious standard the scope of review is a narrow one, and while the reviewing court 'may not supply a reasoned basis for the agency's action,' it should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'

*McCulloch Gas Processing Corp. v. The Dep't of Energy,* 650 F.2d 1216, 1221 (Emer.Temp.Ct.App.1981) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)).

## IV.  ANALYSIS

■ The pivotal issue this Court must resolve is whether the OHA had a rational basis for apportioning 90% to the crude oil refund pool and 10% to the refined products refund pool. This inquiry requires the Court to examine the agency's stated reasons for its action, and as specifically addressed below, the Court believes that the following excerpts illustrate that the agency's action was not arbitrary.

While noting that public comment objected to the refined products refund pool as being *both* excessive *and* insufficient, the ERA stated in support of its 90%–10% apportionment:

> ERA's assessment of the value of refined product and crude oil issues is the result of consideration of the various litigation risks associated with the different cases, the linkage of certain refined product issues which could substantially alter dollar liability amounts, and the relatively early stages of litigation for many of the refined product issues as compared to the crude oil pricing issues.

The OHA may ultimately decide the proportions, but the ERA does not believe any persuasive evidence has been offered by these commenters [sic] to alter ERA's attribution of settlement proceeds to the refined product and crude oil issues.

Final Consent Order with Texaco, Inc., 53 Fed.Reg. 32,929, 32,931 (1988). Once faced with the apportionment issue itself, the OHA restated the ERA's reasoning above and added:

> We have generally relied upon the ERA's divisions of consent order funds into refined product and crude oil pools when ERA has made a reasonable evaluation of the various strengths and weaknesses of the litigation issues composing the basis of the consent order. See *Shell Oil Co.,* 52 FR 47987, 47283 (Proposed Decision and Order), finalized 18 DOE ¶ 85,492 (1989). In some cases where the ERA has not proposed a division of the consent order fund into refined and crude oil pools, we have used the maximum liability for refined products and crude oil in order to divide the consent order fund proportionately. See *e.g., Exxon Corp.,* 52 Fed.Reg. 35313, 35314 (Proposed Decision and Order), finalized 17 DOE ¶ 85,590 (1988) (Exxon).

Notice of Special Refund Procedures, 54 Fed. Reg. 13,420, 13,421 n. 4 (1989).

After reviewing comments and hearing oral argument on the proposed action, the OHA finally concluded:

> We do not agree with the contentions raised in support of either increasing or decreasing the monies in the crude oil and refined product pools. Each one is flawed by self-serving arguments. Initially, it is important to reiterate our position stated in the PDO that the Texaco consent order is a negotiated compromise of all alleged violations, both known and unknown, and not a dollar for dollar settlement of the outstanding DOE enforcement proceedings involving Texaco. In the process of negotiating the consent order, the ERA evaluated the allegations raised against Texaco, and entered into a settlement that it believed fairly concluded all administrative and legal proceedings, as well as accounted

for unknown allegations, litigation risks and interest payment since the date of alleged violation. See PDO, 54 FR at 13421 n. 4; Notice of Final Consent Order with Texaco Inc., 53 FR 32929, 32931 (August 29, 1988). Accordingly it is not proper for the commentors [sic] to attempt to rely on individual remedial orders, either proposed or final, as the sole basis for the composition of the crude oil and refined product pools. None of these proceedings had finality in any sense. Moreover, the Texaco settlement includes potential violations that have not yet ripened into enforcement documents and may not have been previously considered. None of the commentors [sic] considers the impact of these unspecified violations, and therefore, their estimates of the proper size of the crude oil and refined product pools are inadequate.

Implementation of Special Refund Procedures, 54 Fed.Reg. 31,569, 31,571 (1989).

Defendants argue that a 10% allocation is equitable since a 16% refined products liability was not fully sustainable at trial. Indeed, the OHA stated that "the Texaco consent order is a negotiated compromise of all alleged violations, both known and unknown, and not a dollar for dollar settlement of the outstanding DOE enforcement proceedings involving Texaco." 54 Fed.Reg. at 31,571. The government, therefore, contends that the 10% allocation was rational in light of the ERA's assessment of the settlement value of the refined products issues.

Plaintiffs argue, however, that the agency's assessment provides a rationale for the settlement of Texaco's liabilities as a whole and not the apportionment between crude oil and refined products liabilities. The text of the DOE's actions, however, indicates that the ERA and the OHA considered the settlement value of the crude oil cases independent of the refined products cases. In fact, extensive multi-district litigation in the early 1980's resulted in the issuance of the DOE's Modified Restitutionary Policy in Crude Oil Cases [16] providing separate distribution procedures for crude oil cases. It is unlikely that the ERA and the OHA were not keenly aware of the apportionment directive. Regardless, both agencies contemplated such, if not prior to entering the Texaco settlement, once public comment objected to the ERA's proposed $120 million allocation to the refined products refund pool. The important point is that it is clear that this agency action contemplated the crude oil cases independently of the refined products cases as a necessity of judging the propriety of the settlement on the whole.

The issue remains whether the OHA and the ERA demonstrated a rational basis for the apportionment percentages. Plaintiffs take issue with each of the DOE's stated reasons for finding disproportionate settlement values thereby resulting in a comparatively lower allocation to the refined products refund pool. Specifically, Plaintiffs emphasize that the government has yet to produce even one evaluation of the strengths and weaknesses of the crude oil and refined products issues. Doubtless, if the DOE's position were facially arbitrary, the Court would similarly require an agency to substantiate its rationale with clarity. However, Plaintiffs are requiring an unwarranted particularity in this case since common experience demonstrates the rarity of cases where projections of liability even remotely represent settlement value. The process of arriving at a dollar figure in settlement is not reducible to finite determinations and is inherently subject to dispute. To require a line by line analysis would constitute an improper exercise of judicial administration in a matter subject to the exercise of expertise. Prudence requires deference to those with informed judgment.

The OHA stated that it routinely presumes a proportionate settlement value between crude oil and refined products cases absent a recommendation otherwise from the ERA. In fact, Plaintiffs argue for that result, which curiously enough would have likely lead to crude oil claimants arguing caprice had the OHA refused to rely on the ERA's recommendation of a disproportionate settlement value. In this case, however, it is not unreasonable that two distinct liability issues

---

16.  51 Fed.Reg. 27,899 (1986).

would present disproportionate settlement values. The ERA was intimately acquainted with the basis for or, for that matter, the absence of a basis for estimating refined products liabilities at more than $300 million. Once assessing the settlement value at $120 million, the ERA not only possessed the value of its own expertise but also received the benefit of other considerations as a result of public comment. Both the ERA and the OHA, however, relied on their own judgment. It is not unreasonable that the informed judgment of those involved in the enforcement proceedings and settlement with Texaco could conclude that only $120 million would be sustainable at trial. Likewise, it is not unreasonable that the same informed judgment could conclude that the crude oil cases have a proportionately greater settlement value than the refined products cases. Frankly, the refined products claims on the whole are wrought with imprecise determinations that warrant the use of assumptions similar to that in assessing restitution pursuant to a volumetric formula.

Because the proposition that the crude oil cases and the refined products cases have disproportionate settlement values is itself rational, Plaintiffs must show that the assessed settlement values in this case are at least inaccurate. Plaintiffs do not argue, however, that the ultimate allocation or apportionment is so out of line that it is arbitrary. Instead, Plaintiffs argue for a $200 million allocation in reliance on a proportionate estimate of those decision-makers who, in exercising the same judgment, assessed a settlement value at $120 million. The Court declines to substitute its judgment on the mere ground that the DOE's final assessment is not as favorable to Plaintiffs as its initial assessment.

## V. CONCLUSION

Having found that a rational basis supported the agency action, the Court, there-fore, upholds the DOE's allocation of $120 million to the refined products refund pool. Adjudication of the constitutional issue is unnecessary due to the disposition of the regulatory claim. The Court is entering an Order consistent with this Memorandum Opinion.[17]

## ORDER AND JUDGMENT

This case comes before the Court on cross-motions for summary judgment. The Court has thoroughly reviewed the record and the parties memoranda and has detailed its conclusions in a Memorandum Opinion. Therefore, the Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the motion of Plaintiffs for class certification is OVERRULED;

IT IS FURTHER ORDERED that the motions of Utilities, Transporters, and Manufacturers to participate amicus curiae is OVERRULED;

IT IS FURTHER ORDERED that the motion of Plaintiffs for leave to file supplemental memorandum (post-conference with the Court) is SUSTAINED;

IT IS FURTHER ORDERED that the motion of Plaintiffs for summary judgment is OVERRULED;

IT IS FURTHER ORDERED that the motion of Defendants for summary judgment is SUSTAINED and the Complaint is dismissed with prejudice.

This is a final and appealable order and there is no just reason for delay.

---

17. For historical purposes, the Court wistfully notes the passing of the Temporary Emergency Court of Appeals on April 29, 1993 after twenty-two years of temporary service. Richard B. Schmitt, *Temporary Court Set Up In '71 Disbands*, Wall St.J., April 29, 1993, at B7. Query whether there is anyone left with background or interest sufficient to hear an appeal of this case or whether the non-existence of a designated appellate court makes this order effectively final and unappealable. *Contra* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 102, 106 Stat. 4506 (1992). *See also* 12 U.S.C. § 1904 note (1993 Supp.).