117 F.3d 538
 CONSOLIDATED EDISON COMPANY OF NEW YORK, Long Island
Lighting Company, Orange and Rockland Utilities, Pacific Gas
and Electric Company, San Diego Gas and Electric Company,
Southern California Edison Company, Champion International
Corporation, Federal Paper Board Company, Inc.,
International Paper Company, and Weyerhauser Company,
Plaintiffs-Appellants,
v.
Hazel R. O'LEARY, Secretary of Energy, and George B.
Breznay, Director, Office of Hearings and Appeals,
Department of Energy, Defendants-Appellees,
and
States of Alabama, California, Connecticut, Idaho, Indiana,
Maryland, Michigan, Mississippi, Montana, Ohio,
South Dakota, Vermont, Wisconsin, and
Wyoming, Defendants-Appellees,
and
States of Delaware, Hawaii, Illinois, Kansas, Nebraska,
Nevada, North Carolina, Rhode Island, and West
Virginia, Territory of Guam and The
Virgin Islands, Defendants-Appellees.
 Nos. 96-1248, 96-1257.
 United States Court of Appeals,
Federal Circuit.
 June 19, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined Aug. 15, 1997.
 
 Philip P. Kalodner, Gladwyne, PA, argued, for plaintiffs-appellants Consolidated Edison Company of New York, et al.
 Thomas H. Kemp, Office of the General Counsel, U.S. Department of Energy, Washington, DC, argued, for defendants-appellees, Hazel R. O'Leary, Secretary of Energy, et al.
 James F. Flug, Ingersoll and Bloch, Chartered, Washington, DC, argued, for defendants-appellees States of Alabama, et al. With him on the brief were Daniel E. Lungren, Attorney General and Yeoryios C. Apallas, Deputy Attorney General, San Francisco, CA, for defendant-appellee State of California.
 Andrew P. Miller, Dickstein, Shapiro & Morin, L.L.P, Washington, DC, argued, for defendants-appellees States of Delaware, et al. With him on the brief were Alan R. Jenkins, and Bernard Nash, for defendants-appellees States of Delaware, Rhode Island, and West Virginia.
 Before MICHEL, PLAGER and BRYSON, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 At issue in this appeal from judgments of the United States District Court for the District of Columbia[1] is entitlement to a portion of some $2.9 billion recovered by the United States. The money was recovered from producers and resellers of crude oil pursuant to a statutory scheme authorizing such recoveries. See Economic Stabilization Act Amendments of 1971, Section 209, Pub.L. No. 92-210, 85 Stat. 743 (1971). Plaintiffs, a group of utilities and other large crude oil consumers, are entitled to share in the proceeds under the formula established by the Government, but complain that the share they are receiving is insufficient. In two separate suits, consolidated by the district court and here, they sued the United States, through the Department of Energy, and a group of states, all of whom are, under the formula, competing claimants for the fund.
 
 
 2
 The district court dismissed both complaints, and the plaintiffs brought their appeals here. The two questions presented are whether the appeals are properly lodged in this court, and whether the district court correctly gave judgment for the defendants. They are, and it did. Affirmed.
 
 I. BACKGROUND
 
 3
 The Economic Stabilization Act (hereafter "the Act" or "ESA"), first enacted in 1970 and amended in substantial ways in 1971, authorized the President to issue orders and regulations to stabilize prices, rents, wages, and salaries. The Executive actions taken under the Act resulted in lengthy and enduring litigation. This is one of those suits.
 
 
 4
 Under the initial Act, the method of enforcement was by injunction or fine. See Economic Stabilization Act, Pub.L. No. 91-379, 84 Stat. 799 (1970). In 1971 Congress amended the Act, inter alia, to permit district courts, in enforcement suits brought by the Attorney General of the United States, to order "restitution of moneys received in violation" of these price controls. Economic Stabilization Act Amendments of 1971, Section 209, Pub.L. No. 92-210, 85 Stat. 743 (1971).
 
 
 5
 The amended Act, in separate section 210, also provided for a private cause of action for persons "suffering legal wrong because of any act or practice arising out of this title" in violation of the price controls. This "private attorney general" provision allowed private litigants to recover money damages (including treble damages and attorneys fees in some cases) in addition to obtaining injunctive relief. Id.
 
 
 6
 A few years later, in response to the oil embargo by the Organization of Petroleum Exporting Countries (known as "OPEC"), Congress passed the Emergency Petroleum Allocation Act of 1973 ("EPAA"), Pub.L. No. 93-159, 87 Stat. 627, codified at 15 U.S.C. §§ 751-760h (1982), to ensure that petroleum supplies would be available at "equitable prices." EPAA § 4(b)(1)(F), 15 U.S.C. § 753(b)(1)(F) (1982). Petroleum price regulations were subsequently promulgated by the Department of Energy (then called the Federal Energy Office). See 39 Fed.Reg.1924 (Jan. 15, 1974). Section 5(a)(1) of the EPAA expressly incorporates Section 209 of the ESA, thereby authorizing the President to enforce the petroleum price controls by seeking restitution of illegal overcharges. See 15 U.S.C. § 754(a)(1) (1982).
 
 
 7
 Thus a comprehensive regulatory scheme was established pursuant to the EPAA and enforced under Section 209 of the ESA. In due course the implementation and enforcement of this scheme produced huge recoveries for crude oil overcharges. Not surprisingly, there was an ensuing struggle over how this money would be distributed. This struggle came to a head in the multi-district litigation entitled In re The Department of Energy Stripper Well Exemption Litigation, conducted in the District Court of Kansas. See generally In re The Dept. of Energy Stripper Well Exemption Litigation, 653 F.Supp. 108 (D.Kan.1986) (Stripper Well ). As the district court judge noted in that case, "Like flies to honey, claimants are quickly drawn by a fund containing over one billion dollars." Stripper Well, 578 F.Supp. 586, 589 (D.Kan.1984). The particular violations involved in that case are not directly relevant to the present case. What is relevant, however, is the resulting DOE distribution policy that flowed therefrom.
 
 
 8
 Patterned after the eventual settlement in Stripper Well, DOE established a policy for allocating all crude oil overcharges recovered pursuant to Section 209 of the ESA. That policy established that 20% of the overcharges would be retained by DOE to pay individual claims. The remaining 80% was to be allocated half to the United States treasury and half divided evenly among affected states to be used to fund approved energy-related programs that are designed to benefit consumers of petroleum products within the states. See Statement of Modified Restitutionary Policy In Crude Oil Cases, 51 Fed.Reg. 11,737, 11,739 (Aug. 20, 1986). This was essentially the same allocation formula arrived at in the Stripper Well settlement. As DOE stated in its policy statement, the "settlement negotiations provided an appropriate vehicle for exploring the resolution of those issues in all crude oil cases." 51 Fed.Reg. at 11,738.
 
 
 9
 The 20% portion of crude oil overcharges to be distributed to individual claimants was to be apportioned according to a system administered by DOE. This system is known as "Subpart V" after the corresponding DOE regulations. See 10 C.F.R. Part 205, Subpart V. In this system, claimants are entitled to a refund proportional to their volume of crude oil consumption. Stated simply, under this method, known as the "volumetric method," the allocations of overcharges is made by dividing the crude oil overcharge moneys (the "numerator") by the total volume of U.S. consumption of petroleum products during the period of price controls (the "denominator"). This resulting fraction is then multiplied by the individual's volumetric consumption to produce the resulting refund. See Notice Explaining Procedures for Processing Refund Applications in Crude Oil Refund Proceedings Under 10 C.F.R. Part 205, Subpart V, 52 Fed.Reg. 11,737, 11,740 (April 10, 1987). Included in the numerator, for purposes of calculating claims, is an additional amount of some $985 million equal to the amount distributed in Stripper Well, in order to bring claimants into "full parity" with those who recovered under Stripper Well. 51 Fed.Reg. at 11,739.
 
 
 10
 As noted, appellants in this consolidated appeal are a group of utility companies and pulp and paper companies (hereafter referred to collectively as "plaintiffs").[2] They are among some 85,000 individual claimants seeking to share in that portion of the fund allocated to such individual claimants under the Subpart V program. Because of the volume of their purchases of crude oil, the ten plaintiffs receive, pursuant to the formula, approximately 14% of the moneys distributed to all 85,000 claimants. The utility companies, which receive more than three-quarters of the refunds to the ten plaintiffs, are obligated to pass the funds through to their customers.
 
 
 11
 Plaintiffs filed two complaints in the district court for the District of Columbia. In their first complaint, No. 95-CV-698, they sought a declaratory judgment that the 20% limit imposed by DOE should not be used to limit claims under the Subpart V program.[3] In the second complaint, No. 96-CV-225, they challenged the allocation of $275 million received from a settlement of overcharges by Occidental Petroleum Corporation (OXY). They sought a preliminary injunction to preclude DOE from distributing 80% of the available OXY refunds to state and federal governments. The district court denied the requested preliminary injunction and dismissed both complaints on the grounds that plaintiffs did not have standing to assert their claims.
 
 
 12
 Plaintiffs brought their appeals here, but also filed protective appeals in the Court of Appeals for the District of Columbia Circuit. Unopposed motions were filed in, and granted by, that court, deferring briefing until this court determines whether it has jurisdiction over the appeals.
 
 II. DISCUSSION
 A. JURISDICTION
 
 13
 The first question is, which is the proper forum for appellate review, this court or the United States Court of Appeals for the District of Columbia Circuit. The district court exercised jurisdiction over plaintiffs' complaint pursuant to Section 211 of the ESA, which vests district courts with jurisdiction over "cases or controversies arising under this title, or under regulations or orders issued thereunder...." ESA § 211(a). We have jurisdiction over this appeal from the district court's judgment pursuant to 28 U.S.C. § 1295(a)(11), which vests this court with appellate jurisdiction over "an appeal under section 211 of the [ESA]." See Texas Am. Oil Corp. v. United States Dep't of Energy, 44 F.3d 1557, 1563 (Fed.Cir.1995) (Jurisdiction is proper if: "(1) the resolution of the litigation must have required application or interpretation of the EPAA/ESA or its regulations, and (2) the EPAA/ESA issue must have been adjudicated in the district court."). In short, jurisdiction was properly exercised by the district court, and the appeal is properly before us.
 
 B. PLAINTIFFS' CLAIMS
 1. CHALLENGE TO THE 20% LIMIT
 
 14
 It is established law that a complaint should be dismissed for failure to state a claim when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Even assuming the facts asserted in the complaint are true, which we are required to do in reviewing the grant of a motion to dismiss, plaintiffs cannot prevail on their challenge to the 20% cap.
 
 
 15
 Congress established a bifurcated system for enforcing the ESA. Under Section 209, as added in 1971, Congress authorized "the Attorney General to bring an action in the appropriate district court of the United States" for violation of price controls established by order or regulation pursuant to the Act. This public cause of action is enforceable by injunction, as well as by a court order for "restitution of moneys received in violation of any such order or regulation." The legislative history makes clear that Congress wanted courts to have the power to "set things right" by ordering restitution in appropriate cases. S.Rep. No. 92-507, at 9 (1971).
 
 
 16
 DOE acting under this authority has recovered large sums from companies that violated these price controls. See, e.g., Stripper Well ($1 billion); Final Consent Order with Occidental Petroleum Corp., 60 Fed.Reg. 43130 (Aug. 18, 1995) ($275 million); Final Consent Order with Murphy Oil Corp., 59 Fed.Reg. 47315 (Sept. 15, 1994) ($10.7 million); Final Consent Order with Salomon Inc., 55 Fed.Reg. 47374 (Nov. 13, 1990) ($83.75 million); Final Consent Order with Howell Corp., 54 Fed.Reg. 18138 (Apr. 27, 1989) ($19.375 million); Final Consent Order with Texaco, Inc., 53 Fed.Reg. 32929 (Aug. 29, 1988) ($1.25 billion); Final Consent Order with Enron Corp., 53 Fed.Reg. 28260 (July 27, 1988) ($48 million); Final Consent Order with Phillips Petroleum Co., 53 Fed.Reg. 10928 (Apr. 4, 1988) ($30 million); Final Consent Order with Exxon Corp., 51 Fed.Reg. 36052 (Oct. 8, 1986) ($36.9 million); Final Consent Order with Marathon Petroleum Co., 51 Fed.Reg. 3820 (Jan. 30, 1986) ($30 million); Final Consent Order with Atlantic Richfield Co.., 50 Fed.Reg. 26603 (June 24, 1985) ($65.7 million); Final Consent Order with Gulf Oil Corp., 50 Fed.Reg. 24929 (June 14, 1985) ($142 million); Final Consent Order with Mobil Oil Corp., 49 Fed.Reg. 30354 (July 30, 1984) ($27 million).
 
 
 17
 In addition to authorizing the Attorney General of the United States to pursue violators, Congress in the 1971 amendments also authorized individuals "suffering legal wrong" to bring an action against violators. Section 210 of the ESA authorizes:
 
 
 18
 Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages.
 
 
 19
 This section further vests district courts with the power to award treble damages and attorney's fees. See ESA § 210(b). Congress adopted this section "so that it would serve not only to provide a means to recover losses, but [to] provide a strong deterrent to those who would willfully violate this Act." H. Rep. No. 92-714, at 8 (1971). Congress thereby created a powerful incentive for harmed individuals to vindicate their private rights under this section of the ESA, paralleling those in other statutory schemes. See, e.g., 15 U.S.C. § 15 (1994) (violation of antitrust laws); 12 U.S.C. § 2607 (1994) (violation of anti-kickback laws); 7 U.S.C. § 2570 (1994) (violation of plant variety protection laws).
 
 
 20
 In view of Congress' decision to separately structure public and private remedies under the ESA, the question emerges whether a private complaint states a claim upon which relief may be granted when the complaint challenges the allocation of funds obtained under the public remedies section of the Act. Although the district court dismissed the present complaints for lack of standing, and it was that issue that was briefed by the parties before this court, we first must consider whether the action is maintainable, that is, whether plaintiffs have stated a valid cause of action, "for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action...." National R.R. Corp. v. National Ass'n of R.R. Passengers, 414 U.S. 453, 456, 94 S.Ct. 690, 692, 38 L.Ed.2d 646 (1974) (Amtrak ).
 
 
 21
 The Supreme Court has fashioned a four-factor test to determine whether a private cause of action should be implied from a statute not expressly providing one.
 
 
 22
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 23
 Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975) (internal citations omitted). Two of the four factors unquestionably support plaintiffs' position: plaintiffs are a member of the class for whose benefit the statute was enacted and there are no comparable state statutes governing price controls. Subsequent cases, however, have made clear that the remaining two factors predominate. "[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981); Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 145, 105 S.Ct. 3085, 3091-92, 87 L.Ed.2d 96 (1985); Amtrak, supra.
 
 
 24
 In Amtrak, the Court considered whether respondents had a private cause of action to challenge certain train discontinuances in light of § 307(a) of the Rail Passenger Service Act of 1970 ("Amtrak Act"), 84 Stat. 1327, codified at 45 U.S.C. § 501 et seq. That section vested the district courts with jurisdiction over violations of the Amtrak Act as well as created a "public cause of action, maintainable by the Attorney General, to enforce the duties and responsibilities imposed by the Act." Amtrak, 414 U.S. at 457, 94 S.Ct. at 693. In addition, section 307(a) provided a private cause of action, as in the present case, but only under certain circumstances.[4] Id. at 460, 94 S.Ct. at 694. Respondents argued in that case that the court should imply a private cause of action because they "are the intended beneficiaries of the Act." Id. The district court dismissed for lack of standing. The court of appeals reversed and held that respondents, who represented railroad passengers, had standing and that § 307 did not bar a private suit. The Supreme Court reversed.
 
 
 25
 In reaching its decision, the Court was influenced by the existence of a carefully crafted remedial scheme that included both public and private, albeit limited, enforcement. The Court relied heavily on the "frequently stated principle of statutory construction ... that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." Amtrak, 414 U.S. at 458, 94 S.Ct. at 693 (citing Botany Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 131-32, 73 L.Ed. 379 (1929)).
 
 
 26
 As noted, section 209 of the ESA creates a public cause of action to enforce price controls. Section 210 creates a private cause of action to enforce the same. In construing the statutory language, we are guided by our predecessor court's oft-cited warning against "commingling of private and agency enforcement devices for which Congress has made separate provision...." Payne 22, Inc. v. United States, 762 F.2d 91, 93 (Temp.Emer.Ct.App.1985) (citation omitted). In light of this, we conclude that to stretch section 209 so as to encompass plaintiffs' private claims would be to "expand the coverage" of Section 209 "to subsume" those remedies explicitly provided in Section 210.
 
 
 27
 The legislative history does not alter our construction of Section 209. That history makes clear that Section 210 is the exclusive remedy for private litigants. "This action [under Section 210] is intended to be brought by private persons against other private persons. The Government will not bring such action nor be the subject of one." S.Rep. No. 92-507, at 9 (1971); see Cities Service Co. v. Department of Energy, 715 F.2d 572, 573 (Temp.Emer.Ct.App.1983) ("While sections 209 and 210 have a common purpose--the enforcement of DOE's regulations--they vindicate different rights."). If plaintiffs have been injured by overcharges, Congress created a generous remedy for private litigants in Section 210. In cases such as this, when Congress has provided a generous private remedy, we should be even more reluctant than the Court was in Amtrak to imply a private cause of action into a public one for fear of upsetting the delicate balance that Congress struck. See Massachusetts Mutual, 473 U.S. at 146, 105 S.Ct. at 3092 ("The six carefully integrated civil enforcement provisions found in § 502(a) of the [ERISA] statute ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly."). Thus we conclude, as did the trial court, that plaintiffs' complaint challenging the 20% limit should be dismissed.[5]
 
 2. CHALLENGE TO INDIVIDUAL DISTRIBUTIONS
 
 28
 Plaintiffs' second complaint challenged DOE's distribution of funds received from a settlement for overcharges by Occidental Petroleum. In this complaint plaintiffs requested that the district court order DOE to reallocate the 40% payable to the federal government to the claimants' pool thereby bringing their pool's share up to 60%, i.e., 20%+40%=60%. Their basis for this claim was that even this increased amount was less than plaintiffs would have been entitled to had the Government not settled a potential $1.1 billion claim for a mere $275 million. Plaintiffs cite Mullins v. Department of Energy, 50 F.3d 990 (Fed.Cir.1995) for support, on the theory that since we reached the merits of the claim, we must have implicitly decided that there was standing to challenge the allocation under § 209.
 
 
 29
 We agree with plaintiffs that Mullins decides the fate of this complaint. We disagree, however, as to what that fate is. In Mullins this court reviewed a challenge by several gasoline station owners to a final consent order between DOE and Texaco for alleged overcharges. Texaco's liability was estimated to be "in the billions of dollars." Id. at 991. The final settlement, however, set Texaco's liability at $1.2 billion. The settlement fund was to be allocated between two funds: one for restitution for violations regarding sales of crude oil, the other for restitution for violations regarding sales of refined products. Despite an initial estimate that attributed 84% of the overcharges due to crude oil sales and 16% due to the sale of refined products, the final allocation reserved 90% for the crude oil fund and 10% for the refined fund. Plaintiffs in that case challenged this allocation as inequitable and not supported by substantial evidence. Id. at 992. This court held that this allocation is effectively unreviewable on appeal, "[m]uch like the decisions of prosecutors regarding who to prosecute and who not." Id. at 993.
 
 
 30
 The same is true in this case. Plaintiffs are challenging the settlement as well as the allocation between various funds of moneys received from an individual violator. This they cannot do under Mullins; the decision regarding the amount to settle for in a given case, in the absence of fraud or collusion, is a decision within the discretion of DOE. Id. As such it is non-justiciable. See Murphy v. United States, 993 F.2d 871, 873 (Fed.Cir.1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct. Unless such a test or standard is provided, courts must abstain." (internal citations omitted)); Voge v. United States, 844 F.2d 776, 780 (Fed.Cir.1988). Accordingly, we affirm the district court's judgment with respect to No. 96-CV-225.
 
 
 31
 In sum, the district court dismissed plaintiffs' complaints for lack of standing. Rather than resting our decision on standing we conclude that, with regard to the 20 % cap, plaintiffs have failed to assert a claim upon which relief can be granted because private claimants have no express or implied cause of action under Section 209 of the ESA or under the PODRA. Plaintiffs' challenge to the distribution of funds received as a result of individual settlements likewise fails because this is a matter committed to the discretion of the agency.
 
 CONCLUSION
 
 32
 Accordingly, the decisions of the district court dismissing both complaints are
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 Consolidated Edison Co. of New York v. Hazel R. O'Leary, Nos. 96-0225 and 95-0698 (D.D.C.)
 
 
 [2]
 Plaintiffs brought their suits as class actions under Federal Rule of Civil Procedure 23(a). The class, however, was never certified by the district court
 
 
 [3]
 In an additional count, plaintiffs challenge a proposed distribution to the Defense Logistics Agency ("DLA") of the United States on the ground that the DLA is a government agency, which should be paid out of the share allocated to the United States. Since plaintiffs' right to bring this count is subsumed under the discussion regarding their second complaint, infra, it is not discussed separately
 
 
 [4]
 Section 307(a) provided:
 If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this chapter, obstructs or interferes with any activities authorized by this chapter, refuses, fails, or neglects to discharge its duties and responsibilities under this chapter, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to precedent or terminate any violation, conduct, or threat.
 Amtrak, 414 U.S. at 456-57, 94 S.Ct. at 692.
 
 
 [5]
 Plaintiffs also rely on the Petroleum Overcharge Distribution and Restitution Act of 1986 (PODRA), 15 U.S.C. § 4501 et seq. in its complaint. The PODRA, however, provides only for the recovery of refunds through administrative proceedings that are consistent with the 20% limit. See 15 U.S.C. §§ 4502(b)(1)(A)-(C) (1994). Accordingly, a cause of action does not lie under that statute